George W. Knipe and Dorothy K. Knipe, et al. [1] v. Commissioner. Knipe v. Commissioner
Docket Nos. 3988-62, 3989-62, 3990-62. .
United States Tax Court
T.C. Memo 1965-131; 1965 Tax Ct. Memo LEXIS 199; 24 T.C.M. (CCH) 668; T.C.M. (RIA) 65131; May 17, 1965
Gordon W. Gerber, for the petitioners. Albert Squire, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income tax of the petitioners for the following years in the indicated amounts: Docket
Petitioners
No.
Year
Deficiency
George W. Knipe and Dorothy K. Knipe
3988-62
1956
$ 8,303.71
1957
5,704.64
1958
6,314.62
1959
5,801.00
1960
6,970.21
Howard C. Berky and Emma M. Berky
3989-62
1956
8,146.99
1957
5,728.22
1958
6,188.23
1959
5,886.40
1960
7,176.69
Equitable Publishing Company
3990-62
1956
17,711.30
1957
14,621.17
1958
15,753.38
1959
15,539.14
1960
24,315.80
Issues presented by the *201 pleadings for determination are the correctness of the respondent's action as follows: In the case of George W. Knipe and Dorothy K. Knipe, Docket No. 3988-62: (1) In determining that the following amounts paid by Equitable Publishing Company to George W. Knipe as traveling expenses during the indicated years constituted constructive dividends received by him and accordingly were includable in his gross income for the respective years: Year
Amount
1956
$1,560.00
1957
1,593.35
1958
1,621.05
1959
1,566.45
1960
1,530.00 (2) in determining that the following amounts for the indicated years representing one-half of certain sums paid by Equitable Publishing Company to North Penn Publishing Company during the respective years and denominated Advertising Participation Expenses constituted constructive dividends from Equitable Publishing Company to George W. Knipe and accordingly were includable in his gross income for the respective years: Year
Amount
1956
$15,381.50
1957
12,368.32
1958
13,665.25
1959
13,404.54
1960
16,274.17 and (3) in failing to determine that assessment of the deficiences for 1956, 1957, and 1958 was barred by the *202 expiration of the applicable periods of limitation. In the case of Howard C. Berky and Emma M. Berky, Docket No. 3989-62: (1) In determining that the following amounts paid by Equitable Publishing Company to Howard C. Berky as traveling expenses during the indicated years constituted constructive dividends received by him and accordingly were includable in his gross income for the respective years: Year
Amount
1956
$1,737.18
1957
1,787.64
1958
1,695.12
1959
1,889.73
1960
1,661.15 (2) in determining that the following amounts for the indicated years representing one-half of certain sums paid by Equitable Publishing Company to North Penn Publishing Company during the respective years and denominated Advertising Participation Expenses constituted constructive dividends from Equitable Publishing Company to Howard C. Berky and accordingly were includable in his gross income for the respective years: Year
Amount
1956
$15,381.51
1957
12,368.32
1958
13,665.25
1959
13,404.54
1960
16,274.17 and (3) in failing to determine that assessment of the deficiencies for 1956, 1957, and 1958 was barred by the expiration of the applicable periods *203 of limitation. In the case of Equitable Publishing Company, Docket No. 3990-62: (1) In determining that the following amounts received by petitioner during the indicated years from advertisers and not reported as income but accrued as due to North Penn Publishing Company and denominated as Advertising Participation Expenses constituted gross income of the petitioner for the respective years and were properly to be reported as such and were not allowable as deductions for such years: Year
Amount
1956
$30,763.01
1957
24,736.64
1958
27,330.50
1959
26,809.08
1960
32,548.34 (2) in determining that the following amounts for the indicated years paid to George W. Knipe and Howard C. Berky and deducted as traveling expenses did not constitute ordinary and necessary business expense and were not allowable deductions: Year
Amount
1956
$3,297.18
1957
3,380.99
1958
3,316.16
1959
3,456.18
1960
3,191.15 (3) in determining that the amounts of $13,096.56 and $7,082.44 deducted by petitioner for 1960 for professional engineers' services and professional legal services, respectively, were not deductible as ordinary and necessary business expense *204 but constituted capital expenditures, no part of which was recoverable by way of deduction for depreciation or amortization; and (4) in failing to determine that assessment of the deficiencies for 1956, 1957, and 1958 was barred by the expiration of the applicable periods of limitation. General Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners George W. Knipe, sometimes hereinafter referred to as Knipe, and Dorothy K. Knipe, husband and wife and residents of Lansdale, Pennsylvania, filed their joint Federal income tax returns prepared on the calendar year basis and cash receipts and disbursements method of accounting for 1956 through 1960 with the district director in Philadelphia, Pennsylvania. Dorothy K. Knipe is involved herein solely by reason of the fact that she joined in filing the joint returns for the foregoing years. The petitioners Howard C. Berky, sometimes hereinafter referred to as Berky, and Emma M. Berky, husband and wife and residents of Lansdale, Pennsylvania, filed their joint Federal income tax returns prepared on the calendar year basis and cash receipts and disbursements method of accounting for 1956 through *205 1960 with the district director in Philadelphia, Pennsylvania. Emma M. Berky is involved herein solely by reason of the fact that she joined in filing the joint returns for the foregoing years. The petitioner Equitable Publishing Company, sometimes hereinafter referred to as Equitable, a Pennsylvania corporation incorporated February 7, 1927, and having its principal office and place of business in Lansdale, Pennsylvania, filed its Federal income tax returns for 1956 through 1960 with the district director in Philadelphia, Pennsylvania. At all times relevant herein Equitable has kept its books of account and prepared its Federal income tax returns on a calendar year basis and an accrual method of accounting. Since approximately 1928 and at the same location, presently known as 307 Derstine Avenue, in Lansdale, Pennsylvania, Equitable has published and sold in Lansdale and the North Penn Valley area every day, except Saturdays and Sundays, a daily newspaper known as the "North Penn Reporter," sometimes hereinafter referred to as the Daily Reporter. Lansdale is in Montgomery County about 25 miles northwest of downtown Philadelphia and is the urban center of an area known commercially *206 as the North Penn Valley. The Daily Reporter carried news gathered from throughout the nation and the world and also carried national advertising. During the period May 1939 through May 1943 Equitable also published and distributed in the same circulation area as the Daily Reporter each Thursday, without charge, a publication known as "North Penn Buyers' Guide and Home Digest." That publication, which was of the type referred to in the newspaper business as a "throw-away" or "shopper," was discontinued in May 1943 due to the shortage of newsprint and was not resumed after the removal of restrictions on newsprint in 1952. Following the incorporation of Equitable on February 7, 1927, Knipe was employed by it on February 23, 1927, as editor and continuously since that time has been so employed. In addition, Knipe became president and assistant treasurer of Equitable on January 8, 1946, and since January 13, 1948, has been president and treasurer. Berky entered the employment of Equitable on November 11, 1935, as advertising manager and continuously since that time has been so employed. He also continuously since January 8, 1946, has been vice president of Equitable. From January 8, 1946, to *207 January 13, 1948, he also was assistant manager and assistant publisher and since January 13, 1948, has been secretary and publisher. Continuously from January 8, 1946, until the present, Knipe and Berky have been members of the board of directors of Equitable. From January 8, 1946, until his resignation on March 28, 1958, W. H. Weingartner was the third member of the board. Since March 28, 1958, John G. Skibbe has been the third member of the board. The authorized capital stock of Equitable consisted of 750 shares. Prior to 1945 neither Knipe nor Berky owned any of the stock. On December 27, 1945, 10 shares of Equitable were held by it as treasury stock. Walter L. Sanborn owned 673 shares and the remaining 67 shares were owned by 16 other stockholders. On December 27, 1945, Knipe and Berky entered into an agreement with Sanborn whereby each agreed to purchase 125 shares of stock in Equitable. Sanborn died on October 20, 1947, at which time Equitable stock, other than the 10 shares of treasury stock, was owned as follows: Sanborn 629 shares, Knipe 38 shares, Berky 38 shares, and the remaining 35 shares by nine other stockholders. Following Sanborn's death, Knipe and Berky purchased *208 in equal amounts additional shares of stock in Equitable from its other stockholders so that as of March 28, 1952, the stock in Equitable, other than the 10 shares of its treasury stock, was owned as follows: Knipe 313 shares, Berky 313 shares, another individual stockholder 2 shares, and Philadelphia National Bank, trustee of three separate trusts, a total of 112 shares. The foregoing situation as to ownership of Equitable stock continued until in 1959 when, on January 10 of that year, Knipe and Berky purchased in equal amounts all of the 100 shares held by Philadelphia National Bank in one of the above-mentioned trusts and on July 29 of the same year they purchased in equal amounts all of the 10 shares held by Philadelphia National Bank in another of the above-mentioned trusts. On April 5, 1961, Knipe and Berky purchased in equal amounts the 2 shares held by Philadelphia National Bank in the third of the above-mentioned trusts. Thereupon they became, with the exception of the 10 shares of treasury stock, the owners of all of the stock in Equitable, aside from 2 shares of the stock of another individual which had been held by him from about 1952. Equitable has never declared or *209 paid a formal dividend. North Penn Publishing Company, sometimes hereinafter referred to as North Penn, is a Pennsylvania corporation formed on September 26, 1950, by Charles J. Maguire, Jane K. Maguire, William V. Sinnott, and Margaret A. Sinnott, his wife, with an authorized capital stock of 350 shares of a par value of $100 each, of which 210 shares were issued. The articles of incorporation of North Penn recited that the value of the property with which it would begin business was $25,000. From the date of its incorporation until the present, North Penn has been publishing and distributing free in the same circulation area as the Daily Reporter, each Thursday, from its office and place of business at 5 North Cannon Avenue, Lansdale, a publication known as the "North Penn News," sometimes hereinafter referred to as the Weekly News. Prior to the incorporation of North Penn and continuously since about September 1934, the Weekly News had been published and distributed in the same circulation area as the Daily Reporter by undisclosed individual proprietors with undisclosed financial results. Although the Weekly News was being published and distributed and Equitable was not publishing *210 and distributing a "shopper" or "throw-away" and despite limitations on newsprint, the advertising published in the Daily Reporter increased in each of the years 1945 to 1950. Since at least October 1, 1952, North Penn has kept its books of account and prepared its Federal income tax returns on a fiscal year basis beginning October 1 and ending September 30 and on an accrual method of accounting. At all relevant times the Weekly News, which is of a type referred to in the newspaper business as a "throw-away" or "shopper," has differed from the Daily Reporter and the usual newspaper in that the Weekly News consisted mostly of display advertising. The issues of the Weekly News have contained relatively little news and that news has been of local events. During a number of weeks prior to June 1952, Knipe and Berky heard reports that the Weekly News was for sale or was to be discontinued or that something was to happen to it. In June of that year the stockholders of North Penn (Weekly News), through a third party, informed Berky and Knipe that they (the stockholders) were interested in disposing of the Weekly News. Berky and Knipe discussed between themselves what might be the best *211 course for them to follow with respect to the purchase of the stock of North Penn. As Berky and Knipe viewed the situation, a choice between three courses of action was open to them, namely: (1) let the Weekly News die and think nothing would happen; (2) do nothing, let the publication of the Weekly News go into the hands of someone else who might purchase the stock and who might be more aggressive and dangerous to Equitable (Daily Reporter) than the then owners had been; and (3) to purchase the North Penn stock themselves. Knipe and Berky were of the opinion that if they purchased the stock and did not push the business of North Penn, its income would decrease. However, they considered it would not be good business judgment for North Penn to operate in competition with Equitable. They also were of the opinion that for North Penn not to operate competitively with Equitable some arrangement might become necessary whereby a portion of the income of Equitable would be allocated to North Penn in order to enable it to continue in operation. Knipe and Berky finally decided to and did purchase the stock of North Penn under the terms of an agreement which contained the following: AGREEMENT *212 made this 26th day of July, 1952 by and between Charles J. Maguire and Jane K. Maguire and William V. Sinnott and Margaret A. Sinnott, his wife (hereinafter called "Sellers") and George W. Knipe and Howard C. Berky (hereinafter called "Buyers") and High, Swartz, Childs & Roberts, Escrow Agents (hereinafter called "Agents"); WITNESSETH that the parties hereto in consideration of their mutual undertakings and intending to be bound hereby do mutually promise and agree as follows: 1. Simultaneously with the execution of this Agreement, sellers have and hereby do sell to the buyers, or their nominee or nominees, all the shares of stock in the North Penn Publishing Co. standing in their respective names for the sum of twenty-four thousand dollars ($24,000.00). 2. Of this amount, eleven thousand dollars ($11,000.00) shall be placed in escrow with the Agents and used by them to pay all lawful debts, judgments, claims, liens and encumbrances owed by North Penn Publishing Co. at the time of the execution of this Agreement. Such payments shall be made as promptly as possible and any balance remaining thereafter shall be paid to sellers. Sellers further agree to indemnify and hold the buyers *213 harmless against any debts, judgments, claims, liens and encumbrances in excess of $11,000.00. 3. The sellers represent and warrant to the buyers: (a) That the authorized number of shares in North Penn Publishing Co. is 350 with a par value of $100.00 per share and that the outstanding shares are 210 in number owned as follows: Jane K. Maguire
1
Charles J. Maguire
104
Margaret A. Sinnott
1
William V. Sinnott
104
Title to the stock owned by the sellers is clear and marketable and is subject to no liens and encumbrances. (b) That North Penn Publishing Co. is duly chartered, organized and authorized to do business in the Commonwealth of Pennsylvania. (c) That they will assist in the collection of all accounts owned by North Penn Publishing Co.
(d) That they will procure the resignation of the present officers of the North Penn Publishing Co.
(e) That they have not, nor will they in the future, do anything to affect adversely the assets or operation of North Penn Publishing Co.
4. Sellers agree not to engage in, become connected with, or have any interest in any business involving the publishing of any newspaper or advertising medium or solicitation *214 of advertisement for the same for a period of ten years within the distance of ten miles from the Borough of Lansdale, Montgomery County, Pennsylvania. 5. The Agents agree to pay the outstanding debts, judgments, claims, liens and encumbrances as promptly as possible and to turn over any surplus to the sellers. It is agreed by all of the parties that no part of the sum of eleven thousand dollars ($11,000.00) shall be retained by the Agents for more than six months from the date of the execution of the Agreement. Since July 26, 1952, Knipe and Berky have been the sole owners of the outstanding shares of North Penn stock and each has owned 50 percent of the outstanding shares. Since that date, Berky has been president and treasurer, Knipe has been vice president and secretary, and Knipe and Berky and their wives have constituted the board of directors. At the time Berky and Knipe purchased the stock of North Penn they knew the corporation was in a straitened financial condition; that from its inception in September 1950 it had been operating at a loss; that it had maintained its records in a manner not considered appropriate by Berky and Knipe and that North Penn was delinquent *215 in filing Federal and state tax returns. They also had considered the matter of a possible setting up between Equitable and North Penn at some indefinite future time of an "advertising participation program," the details of which they had not determined, whereby a portion of Equitable's receipts from advertising might be allocated or apportioned to North Penn. Following the purchase of the North Penn stock and on the same day, July 26, 1952, a special meeting of the stockholders of North Penn, Berky and Knipe, was held at which a resolution was adopted providing that - Charles S. Rockey & Company be elected as independent accountants of the company, to examine all accounts from the date of incorporation, to compile all pertinent data necessary to establish an appropriate system of accounts, prepare and file all delinquent tax returns and to formulate a fair basis for the establishment of a plan which would resolve the equities in the ethical operation of the two companies, namely the Equitable Publishing Company and the North Penn Publishing Company. There has never been a merger of Equitable and North Penn nor has there been a dissolution of either of them. At all times the corporations *216 have been two separate corporate entities and have operated as such. The two corporations at all times have maintained and kept separate books and records and have had their own separate employees. North Penn has never paid a formal dividend. Equitable Publishing Company, Docket No. 3990-62. Issue 1. Includability in Gross Income of Equitable of Amounts Denominated Advertising Participation Income Findings of Fact Following the purchase of North Penn stock by Knipe and Berky, that corporation continued the publication and free distribution, each Thursday, of the Weekly News in the same area as before, namely, the circulation area of the Daily Reporter. In the distribution of the News, which was by carrier boys employed for that purpose, no check was made to ascertain whether any people living in the houses to which it was delivered were subscribers to the Daily Reporter. Although the Weekly News and the Daily Reporter both published display advertising on Thursdays, Knipe and Berky in directing the affairs of the News did not attempt to secure advertising for the News to the detriment of the Reporter. The advertising solicitors for the News were instructed to solicit advertising *217 for the News, to accept advertising for the Reporter if offered them, to recommend the Reporter as the preferable media for advertising if asked to compare the value of advertising in the two publications, and to defend the Reporter if they heard criticism of it. In a few instances persons who had received training in the employ of North Penn were given regular employment by Equitable in its business. On a limited number of occasions other employees of North Penn have been used briefly by Equitable on temporary assignments. Pursuant to the resolution adopted in a special meeting of the stockholders of North Penn on July 26, 1952, Charles S. Rockey & Company was employed as North Penn's accountants. The Rockey firm also performed Equitable's accounting work. The member of the Rockey firm assigned to do and who actually did perform the accounting and tax work of both Equitable and North Penn was Hiram K. Gottshall. As provided for in the foregoing resolution of July 26, 1952, Gottshall reconstructed North Penn's records from the date of its inception in 1950 and installed a set of books for it. In addition he prepared delinquent Federal and state income tax returns and other returns *218 for North Penn. He also is the person who prepared all of the Federal income tax returns for Equitable, Knipe, and Berky for the years involved herein. On August 4, 1954, North Penn filed delinquent Federal income tax returns for the indicated taxable years in which net losses were reported as follows: Taxable year ended
Sept. 30 -
Net loss
1951 (first year of operation)
$3,612.28
1952
7,052.37
1953
4,674.77
In its Federal income tax returns filed for the following indicated years North Penn reported net losses as follows: Taxable year ended
Sept. 30 -
Net loss
1954
$9,074.96
1955
6,920.69
As of its fiscal year ended September 30, 1955, North Penn had a net operating loss carryover of $31,335.07. The escrow agents, parties to the agreement of July 26, 1952, pursuant to which Knipe and Berky purchased the stock of North Penn and with which agents $11,000 of the $24,000 purchase price of the stock was placed in escrow for use in payment of indebtedness of North Penn outstanding on the foregoing date, rendered their accounting on February 17, 1954, showing final payment of such indebtedness in the total amount of $14,163.54. Subsequently *219 and on January 17, 1955, the annual meeting of the stockholders of North Penn, Knipe and Berky, was held. The minutes of the meeting contain the following: The motion was made and duly passed, that in view of the fact the accountants have made a preliminary report, which were discussed, upon examination of accounts from the date of incorporation to the fiscal year ending 1955, at which time the accountants had assembled the accounting data, completed tax returns and devised appropriate system of accounts on which the basis of the recommendation for the establishment of the plan to resolve the equities of the two companies. The plan as outlined by the independent accountant [Gottshall] was based upon research and consideration for the betterment of service to the community of both companies, the possible economy of operations and more favorable earnings for contemplated future expansion and advantages thereby inuring to the Federal, State and Local governments. The operating results were equitably and reasonably resolved on the basis of the total advertising ratio for the current year as compared to the average ratio for the first two years during the transition in management *220 of the North Penn Publishing Company, reduced by 25% for the otherwise normal growth of the Equitable Publishing Company, which basis was mutually agreed upon by both companies to become first effective for the fiscal year of the North Penn Publishing Company beginning October 1, 1955 and ending September 30, 1956. [Emphasis added.] The record is silent as to the manner in which Equitable agreed to the recital set forth in the foregoing minutes - whether orally or in writing - and as to the date of such agreement. The reference at the beginning of the second quoted paragraph of the foregoing minutes to "The plan as outlined by the independent accountant" refers to a plan presented orally by Gottshall to Knipe and Berky. For North Penn's fiscal year ended September 30, 1956, Gottshall computed the amount of Equitable's advertising receipts North Penn was entitled to receive as advertising participation income to be $24,225.28. As disclosed by Gottshall's worksheets for that year, he computed the foregoing amount as follows: Current Year's Computation He compared North Penn's receipts from advertising for the 12 months ended September 30, 1956, with the total of North Penn's *221 and Equitable's receipts from advertising for that period and arrived at 3.77 percent. Base Period Computation (a) He computed an arithmetical average of Equitable's gross receipts from advertising for the 2 calendar years 1951 and 1952, arriving at $192,789.05. (b) He computed an arithmetical average of North Penn's gross receipts from advertising for the 2 fiscal years ended September 30, 1951, and September 30, 1952, arriving at $28,557.88. (c) He then compared the $28,557.88 with the sum of $28,557.88 and $192,789.05, a total of $221,346.93, and arrived at 14.90 percent. [2]
Comparison of Current Year With Base Period (a) He then subtracted the 3.77 percent obtained in the Current Year's Computation from the 14.90 percent he obtained in the Base Period Computation and arrived at the difference, 11.13 percent. (b) He then reduced the 11.13 percent by one-fourth of itself, or to 8.3475 percent. His worksheet describes this decrease as: "Adj. for normal increase in economy." (c) Finally, he computed what 8.3475 percent of Equitable's advertising *222 receipts for the 12 months ended September 30, 1956 ($290,210.05) would amount to and arrived at $24,225.28, describing this resulting amount as follows: Participation as mutually agreed upon for the year ending 9/30/56 is total of "Equitable" $290,210.05 X 8.3475% = $24,225.28. After the end of each of North Penn's taxable years ended September 30, 1957, to September 30, 1960, inclusive Gottshall made similar computations of the amounts which North Penn was to receive from Equitable. His computations resulted in the following amounts: Taxable year ended
Advertising
Sept. 30 -
participation
1957
$24,651.85
1958
26,468.45
1959
27,219.40
1960
31,161.49
In each of the computations referred to above, Gottshall used the same base period he had used in his computation for the year ended September 30, 1956. However, these later computations all used the arithmetically correct percentage of 12.90 as the base period percentage, rather than 14.90 which was used as the base period percentage in the computation for the year ended September 30, 1956, and which was arithmetically incorrect. In each of his computations for the years ended September 30, 1957, to *223 September 30, 1960, inclusive, Gottshall, after subtracting the current year's percentage from the base period percentage, reduced the resulting percentage by one-sixth of itself, rather than one-fourth, the amount he had used in his computation for the year ended September 30, 1956. His worksheet for the year ended September 30, 1957, explained this adjustment as follows: "Adjust for normal increase in economy." His worksheets for the years ended September 30, 1958, and September 30, 1959, showed the one-sixth adjustment but did not explain it. His worksheet for the year ended September 30, 1960, explained this adjustment as follows: "Allowance for 16 2/3% growth." Berky, Knipe, and Gottshall agreed that a reduction factor should be applied to the percentage obtained by subtracting the current year's percentage from the base period percentage because they felt that Equitable's daily "would have had a certain growth within the area in spite of competition." Berky, Knipe, and Gottshall used one-fourth as a reduction factor for the year ended September 30, 1956, and one-sixth for the later years because they felt that "the economy in Lansdale and the North Penn area, as well as the *224 national economy, had a larger growth rate * * * [in the year ended September 30, 1956] than it did in * * * [the succeeding years]." These reduction factors were "based entirely upon what * * * [they] felt was a proper share of the growth in the area, as well as the national economy." The arithmetical formula used to compute the advertising participation could not under any circumstances result in amounts being payable by North Penn to Equitable. Computation of Advertising Participation (Calendar Years) After the end of each of Equitable's calendar years 1956 to 1960, inclusive, Gottshall computed the amount of advertising participation for the previous calendar year. He did this by making adjustments to the amount of advertising participation he had computed for the fiscal year ended on the previous September 30. These adjustments consisted of adding to the fiscal year amount, an amount for the following October, November, and December, and, except for his computation for the year 1956, subtracting therefrom the advertising participation computed for October, November, and December of the previous year. He computed advertising participation for October, November, and *225 December, by applying the same percentage he had used for the fiscal year, to Equitable's receipts from advertising for the following October, November, and December. For example, he computed advertising participation for the calender year 1957 as follows: 1. Advertising participation for fis-
cal year ended September 30, 1957
$24,651.85
2. [Equitable's receipts from adver-
tising for October, November
and December 1957
$79,390.48
3. Add - 8.3417 percent of $79,390.48
$ 6,622.52
4. Advertising participation for 15
months ended December 31, 1957
31,274.37
5. Less - Advertising participation for
October, November, and Decem-
ber 1956
6,537.73
6. Advertising participation for calen-
dar year 1957
$24,736.64
Gottshall made the computations of advertising participation income for the calendar years 1958 to 1960, inclusive, in the same manner as above. The amounts produced by his computations are as follows: Calendar
Advertising
year
participation
1957
$24,736.64
1958
27,330.50
1959
26,809.08
1960
32,548.34
In his computation of advertising participation income for the calendar year 1956, however, Gottshall did not reduce *226 the advertising participation for the fiscal year ended September 30, 1956, by the advertising participation for October, November, and December 1955. He computed advertising participation for the calendar year 1956, as follows: 1. Advertising participation for fiscal
year ended September 30, 1956
$24,225.28
2. [Equitable's receipts from adver-
tising for October, November
and December 1956
$78,319.57
3. Add - 8.3475 percent of $78,319.57
6,537.73
4. Advertising participation for 15
months ended December 31, 1956
$30,763.01
Each year Equitable and North Penn entered into a new agreement for the payment by Equitable of advertising participation income to North Penn. These agreements were never in writing nor were they entered in the minute book of either corporation. The minutes of the annual meetings of the stockholders of Equitable for the years 1957 through 1961 merely recite the ratification and approval by the stockholders of the actions of the directors since the last annual meeting "including the intercompany advertising income participation." The minutes of the meetings of the directors of North Penn, immediately following the annual meetings of *227 its stockholders, for the years 1957 through 1961 merely recite the ratification by the directors of "the allocations made by the independent accountants of the advertising participation, income and expenses, between the North Penn Publishing Company and the Equitable Publishing Company for the fiscal year ending September 30 for the North Penn Publishing Company and the calendar year ending December 31 of the Equitable Publishing Company." Although from and after October 1, 1955, Equitable made advertising income participation payments to North Penn, there was no change in the operation of the latter from what it theretofore had been. At the trial herein, Knipe did not know whether, as part of the advertising income participation agreements, North Penn had promised to issue a minimum number of copies of the Weekly News. Although he approved Gottshall's computations each year. Knipe was unable to explain the method of computation. Nor could Knipe give any facts to support his stated opinion that the publication of the Weekly News caused the advertising income or circulation income of the Daily Reporter to grow. Although Berky approved the payment of advertising income participation *228 each year by Equitable to North Penn, he did so without noting the effect of the payment on Equitable's net income. The average daily circulation in copies of the Daily Reporter and the average weekly circulation in copies of the Weekly News for the years 1952 through 1960 were as follows: Daily
Weekly
Year
Reporter
News
1952
6,495
7,550
1953
7,043
6,900
1954
7,383
6,750
1955
7,544
6,500
1956
7,979
6,200
1957
8,569
6,200
1958
8,881
6,000
1959
9,432
6,000
1960
9,891
5,600
Subscription income received by Equitable from the Daily Reporter and received by North Penn from the Weekly News for the years 1952 through 1960 was as follows: Daily Reporter
Weekly News
Year
calendar year
fiscal year ended Sept. 30
1952
$32,176.00
$ 4.50 (last quarter only)
1953
38,370.27
14.60
1954
47,892.60
9.50
1955
51,217.22
7.50
1956
$54,691.82
$10.50
1957
62,997.05
15.00
1958
71,792.07
7.75
1959
77,669.74
39.00
1960
78,705.24
55.00
The advertising lineage and billings in dollars of Equitable and North Penn for the years 1951 through 1960 were as follows: Lineage
Billings dollars
Equitable
North Penn
Equitable
North Penn
Equitable
(12 mos. period
(fiscal year
(calendar
(fiscal
(calendar
Oct. 1 thru
Oct. 1 thru
Year
year)
year)
year)
Sept. 30)
Sept. 30)
1951
4,633,868
738,494
$184,564.45
$177,038.31
$31,838.08
1952
5,030,922
506,537
201,009.65
198,398.12
25,277.67
1953
5,308,995
493,783
216,783.86
211,079.00
23,651.20
1954
5,444,130
454,705
245,736.30
237,389.17
18,953.51
1955
5,732,690
370,963
284,996.27
275,763.20
16,145.83
1956
5,595,359
246,999
289,930.01
290,210.05
10,708.98
1957
5,370,929
209,566
296,601.73
295,525.46
7,587.40
1958
5,403,919
154,196
299,621.39
295,462.90
5,577.09
1959
5,599,922
218,204
322,701.70
322,447.48
7,806.89
1960
5,851,426
177,282
356,937.55
346,623.95
5,966.66
*229 The number of general employees and general employee and carrier payrolls of Equitable and North Penn for the years 1952 through 1960 were as follows: Equitable
North Penn
(Calendar year)
(Fiscal year ending Sept. 30)
No. of
General
No. of
General
general
employee
Carrier
general
employee
Carrier
Year
employees
[1] payroll [2] payroll employees
payroll
payroll
1952
33
$ 86,676.56
$2,451.87
9
$19,146.29
[3]$ 341.85 1953
36
98,584.64
2,698.08
5
16,495.37
1,474.25
1954
34
106,397.98
2,318.50
6
14,954.42
1,765.70
1955
35
116,665.84
2,323.46
5
12,503.87
1,808.05
1956
36
128,365.83
2,495.47
5
10,861.45
1,999.70
1957
37
137,616.59
2,752.57
5
11,390.78
2,135.95
1958
46
147,699.59
3,229.84
4
11,994.55
2,389.30
1959
47
163,800.39
3,198.92
4
10,008.73
2,913.60
1960
49
[4] 170,366.85 2,746.00
4
10,145.19
3,038.45
*230 The taxable net income and the income tax thereon reported by Equitable and by North Penn on their respective Federal income tax returns for the indicated years were as follows: Taxable net income
Income taxes
Year
Equitable
[1] North Penn Equitable
North Penn
1952
$31,887.94
($ 7,052.37)
$ 9,266.38
0
1953
23,205.92
( 4,674.77)
6,961.78
0
1954
36,059.99
( 9,074.96)
13,251.19
0
1955
45,924.48
( 6,920.69)
18,380.73
0
1956
26,782.58
14,203.74
8,426.94
0
1957
27,423.79
10,001.93
8,760.37
0
1958
24,168.75
10,283.34
7,250.63
$ 946.18
1959
24,096.39
13,794.72
7,228.92
4,138.42
1960
3,355.40
16,572.24
1,006.62
4,971.67
The following is a summary schedule of North Penn's income and deductions for its taxable years ended September 30, 1956 through September 30, 1960: Year ended September 30
1956
1957
1958
1959
1960
Advertising
$24,225.28
$24,651.85
$26,468.45
$27,219.40
$31,161.49
participation
income from
Equitable
Other receipts
9,716.07
8,765.65
6,810.59
9,493.09
7,599.66
(net)
Total receipts
$33,941.35
$33,417.50
$33,279.04
$36,712.49
$38,761.51
Less - Cost of
16,738.19
18,968.69
17,310.96
15,941.78
15,387.51
goods sold
Gross profit
$17,203.16
$14,448.81
$15,968.08
$20,770.71
$23,373.64
Other income or
360.00
30.00
315.00
(203.36)
420.00
(loss)
Total income
$17,563.16
$14,478.81
$16,283.08
$20,567.35
$23,793.64
Less - Deductions
3,359.42
4,476.88
5,999.74
6,772.63
7,221.40
Taxable income
14,203.74
$10,001.93
$10,283.34
$13,794.72
$16,572.24
before net
operating loss
deduction
Less - Net
(14,203.74)
(10,001.93)
(7,129.40)
operating loss
deduction used
Net income or
None
None
$ 3,153.94
$13,794.72
$16,572.24
(loss)
Income tax
None
None
$ 946.18
$ 4,138.42
$ 4,971.67
liability
*231 On its income tax returns for the calendar years 1956 through 1960, Equitable omitted from its gross receipts the amounts of advertising income participation computed for those years by Gottshall as follows: Advertising income
Year
participation omitted
1956
$ 30,763.01
1957
24,736.64
1958
27,330.50
1959
26,809.08
1960
32,548.34
Total
$142,187.57
On its income tax returns for its fiscal years ended September 30, 1956, through September 30, 1960, North Penn included in its gross receipts the amounts of advertising income participation computed for such years by Gottshall as follows: Year ended
Advertising income
Sept. 30 - participation included
1956
$24,225.28
1957
24,651.85
1958
26,468.45
1959
27,219.40
1960
31,161.49
At all times material herein there was constant, aggressive and extensive competition for advertising in the Daily Reporter's circulation area. The Reporter not only had advertising competition from the metropolitan Philadelphia daily and weekly newspapers which regularly circulated throughout its (Reporter's) circulation area but, in addition, it had constant advertising competition from weekly "throw-aways" *232 and "shoppers" in the North Penn Valley area which regularly came from all sides into its circulation area. In each of the years 1956 through 1960 Equitable had undistributed earnings and profits in excess of the amount of advertising income participation it omitted from its income tax return and paid to North Penn. The several advertising income participation agreements entered into by Equitable and North Penn with respect to the years in issue did not constitute real and genuine business transactions entered into by Equitable for profit or for any other proper business purpose of Equitable but were merely for the purpose of causing Equitable to make distributions of its earnings and profits to North Penn without a business basis to Equitable therefor. In determining the deficiencies against Equitable here involved the respondent determined that the amounts of advertising income participation omitted by Equitable from its gross receipts for the respective taxable years constituted gross income of Equitable for such years and were properly to be reported therein as such and were not allowable deductions for such years. Opinion The petitioners contend that the record clearly *233 shows: (1) that the arrangement between Equitable and North Penn respecting advertising income participation omitted by Equitable in its income tax returns for the years 1956 through 1960 was a real and genuine business transaction entered into between the two corporations for profit, (2) that the amounts involved were the income of North Penn as its appropriate share of the results of its joint effort with Equitable, which received such amounts subject to North Penn's claim of right to such share, and (3) that therefore Equitable was without duty or right to report such amounts as its income. The respondent's determination to the contrary is presumed to be correct. The burden was upon the petitioners to show that it was erroneous and unless that burden has been discharged, the respondent's determination must be sustained. Considering the first provision of the contention of petitioners, we observe that the advertising income participation arrangement was a series of annual oral agreements arrived at solely by Knipe and Berky as the principal officers of the two corporations and as the majority stockholders of Equitable and the sole stockholders of North Penn. The first of such agreements *234 was effective October 1, 1955, the date of the beginning of North Penn's fiscal year ending September 30, 1956. October 1, 1955, also was a date 3 years after the close of North Penn's fiscal year ended September 30, 1952, the year in which Knipe and Berky purchased the stock of North Penn. In support of their contention the petitioners' urge that since 1952 North Penn has been engaged in a joint effort with Equitable to produce advertising billings and subscriptions for Equitable and, as compensation for North Penn's contribution to this joint effort, it has had accrued to it annually by Equitable an amount which has been considered fair and appropriate by all the persons having any knowledge on the subject. As above observed, the first of the oral agreements relating to advertising income participation was effective October 1, 1955, and we find nothing in the record to indicate that it or any of the subsequent oral agreements was intended in any respect to be or was effective retroactively to the period from 1952 to October 1, 1955, or any portion of that period. Accordingly and since the record fails to show that Equitable actually made any accruals to North Penn during that *235 period, the portion of the foregoing contention of the petitioners to the effect that from 1952 until October 1, 1955, Equitable made annual accruals to North Penn is not sustained. As we understand it, the position of the petitioners is that North Penn's contribution to the above-claimed joint effort between it and Equitable consisted (1) of North Penn's promotion of Equitable's advertising and subscription income, and (2) its protection of Equitable from advertising competition by serving, through its ownership, publication, and distribution of the Weekly News, as a buffer or deterrent to other publishers and distributors of weekly throw-aways and shoppers coming into the Daily Reporter's circulation area. We will consider the record respecting North Penn's capacity to provide, and the extent shown to which it did provide, such claimed promotion and protection. Upon its formation in September 1950, North Penn acquired the Weekly News which theretofore had been published and distributed in the Daily Reporter's circulation area for the preceding 16 years with undisclosed financial results. There is no showing that the News, as in the case of Equitable, experienced a yearly increase *236 of its advertising business during the immediately preceding years, or that it had any substantial number of advertising accounts, or that it could or did carry with it a substantial portion of such accounts as it had upon its change to other hands. During the first year of its operation of the Weekly News, the year ended September 30, 1951, North Penn's advertising lineage was 738,494 lines, with respect to which its billings or gross income was $31,838.08, and its net loss for the year was $3,612.28. During the second year of its operation of the News, the year ended September 30, 1952, North Penn's advertising lineage dropped to 506,537 lines, from which its gross income was $25,277.67, and its net loss for the year was $7,052.37. On the other hand, Equitable's advertising lineage increased from 4,633,868 lines in 1951, from which its gross income was $184,564.45, to a lineage of 5,030,922 lines in 1952, from which its gross income was $201,009.65. The record does not disclose the amount of Equitable's net income for 1951 but discloses that the amount of its taxable net income reported for 1952 was $31,887.94, an amount not thereafter equaled in any subsequent year through 1960, *237 except the years 1954 and 1955. Thus it is shown that while in 1952 North Penn lost advertising lineage to the extent of 231,957 lines, Equitable was able to increase its lineage by 397,054 lines despite competition from the various sources of competition in the area. Berky testified to the opinion that the reason for North Penn's operation at a loss for its taxable years ended September 30, 1951, and September 30, 1952, was that the operators thereof were not as ambitions and aggressive as they might have been in directing the activities of the Weekly News. Whatever may have been the reason, Knipe testified that he and Berky, at or about the time of their purchase of the stock of North Penn, were of the opinion that it would not be good business judgment to attempt to operate the News competitively with the Daily Reporter. In view of the foregoing we are unable to conclude that at the time Knipe and Berky purchased the stock of North Penn, July 26, 1952, the Weekly News constituted or ever had constituted any substantial threat to the Daily Reporter or that its prospects for becoming a substantial threat were other than remote. Further, in view of the foregoing and of the aggressive, *238 constant, and extensive competition by the various publications for advertising shown to have been existing in the Daily Reporter's circulation area, we are unable to conclude that the Weekly News, which had operated in that area for upwards of 20 years, could, standing alone, successfully withstand such competition, continue in existence, and constitute a buffer or deterrent to the other publishers of throw-aways and shoppers either operating in the area or contemplating operation in it. The record shows that following Knipe's and Berky's purchase of the stock of North Penn and continuing through the taxable years in issue, North Penn, using its own plant and facilities and its own personnel, continued the publication for free distribution of the Weekly News, in which was published all of the advertising that it was able to obtain. There is no indication in the record that North Penn's plant and facilities were ever used by Equitable for its advertising and publishing business. The number of general employees of Equitable and of North Penn for the indicated years were as follows: North Penn
Equitable
(Fiscal year
(Calendar
ended
Year
year)
Sept. 30)
1952
33
9
1953
36
5
1954
34
6
1955
35
5
1956
36
5
1957
37
5
1958
46
4
1959
47
4
1960
49
4
*239 The foregoing discloses an increase of approximately 50 percent in the number of Equitable's general employees during the period from 1952 through 1960 with the principal portion of the increase occurring in 1958. During the foregoing period there was a decrease of more than 50 percent in the number of North Penn's general employees with the principal portion of the decrease occurring in 1953 when the number of North Penn's general employees was reduced from nine in 1952 to five in 1953. The record does not indicate the reason for the reduction - whether by the voluntary separation by the employees themselves, or otherwise. Walter K. Beattie, who was employed by North Penn from December 29, 1952, a date 5 months after the purchase of the North Penn stock by Knipe and Berky, until May 1953, and again from January 1954 until November 1955, the month following that in which the first of the oral agreements respecting advertising income participation became effective, testified as a witness for the petitioners at the hearing herein. He stated that at the time of his first employment by North Penn he had been studying journalism and was seeking to obtain experience in the newspaper *240 field. However, the record does not show that at that time he had any experience in any field of business. He was employed by North Penn to solicit and otherwise "take care" of advertising in the Weekly News, to help in editing the News, to help in the printshop to the extent of running errands in emergencies, to supervise the distribution of the News by delivery boys, and generally to keep the News operating so as to relieve Berky from the necessity of traveling back and forth between the offices of the News and the Daily Reporter. He testified to the effect that at the time of his first employment Berky made it clear to him that there was no reason to assume that the News "could not stand on its own feet" and "not be kept alive." He further testified that with respect to the performance of his work for the News he was instructed: that if at any time the interest of the News and the Daily Reporter conflicted, the interest of the Reporter was to be considered first; that he was to solicit advertising for the News in the entire Lansdale community and that after having "picked up" the advertising that was more or less regular, he was to solicit advertising for the News in the outlying *241 and rural areas from small advertisers and new businesses in such areas which later might become advertisers in the Daily Reporter; that if he heard the Reporter criticized, he was to defend it; that if asked to compare the relative values of advertising in the Reporter and the News, he was to recommend the Reporter; and that if an advertising customer of the News should ask him to take an advertisement for the Reporter and deliver it to that publication, he was to do so and at the time of taking the advertisement for the Reporter, to attempt to obtain the same advertisement or a reduced version of it for the News. He stated that he followed the foregoing instructions and that in doing so advertisers "quite regularly" asked him to take an advertisement for the Reporter and deliver it to that publication. He further stated that on occasions he ran errands for the Reporter, usually in conjunction with his work for the News, and that on one occasion he was assigned, whether for a few hours or otherwise is not disclosed by the record, to solicit advertising only for the Reporter for a special supplement it published to one of its daily issues. Beattie did not state, nor was he asked to *242 state, nor does the record otherwise show the portion or the approximate portion of his time while employed by the News which was spent in performing services for or in behalf of the Daily Reporter. Further, he did not state, nor was he asked to state, nor does the record otherwise show, either in terms of lineage or in money, the amount or the approximate amount of advertising he received and turned over to Equitable during any portion of either period of his employment. However, to the extent shown herein, it would appear that such part of his time as was spent in handling advertising for Equitable was not substantial and was largely incidental to his work for the News. In its income tax returns for 1956 through 1960, Equitable reported that for the respective years Knipe and Berky as officers thereof devoted all of their time to its business. The returns disclose that the total compensation paid Knipe and Berky as officers thereof was: 1956, $44,533.26; 1957, $45,089.36; 1958, $42,266.34; 1959, $42,203.60; and 1960, $46,080.10, and that one-half of the amount for each year was paid to Knipe and one-half to Berky. Knipe and Berky did not receive from North Penn any compensation *243 for such services as they rendered to it. In its income tax returns for its fiscal years 1956 through 1960 North Penn reported that Knipe and Berky devoted to its business such part of their time as was necessary. Such being the state of the record and there being no showing to the contrary, we conclude that such time as Knipe and Berky devoted to the affairs of North Penn during the years 1956 through 1960 was a portion of the time for which they received compensation from Equitable. In such situation we think it apparent that North Penn made no contribution to any claimed joint operation with Equitable based on the services rendered by its officers, Knipe and Berky, which would warrant further compensation therefor by Equitable. As shown by our findings Equitable's advertising lineage increased from 5,030,922 lines in 1952 to 5,732,690 lines in 1955, an amount of lineage neither exceeded nor equaled until 1960 when its lineage amounted to 5,851,426 lines, or only 118,736 lines in excess of that for 1955. North Penn's lineage declined from 506,537 lines in 1952 to 370,963 lines in 1955, and to 177,282 lines in 1960. Equitable's gross income from advertising increased from $201,009.65 *244 in 1952 to $284,996.27 in 1955, and to $356,937.55 in 1960. North Penn's gross income from advertising decreased from $25,277.67 in 1952 to $16,145.83 in 1955, and to $5,966.66 in 1960. Again the petitioners have not shown or submitted evidence from which we can ascertain, either in terms of lineage or in terms of money, for any year or years during the period 1956 through 1960, the portion or the approximate portion of Equitable's advertising that was obtained either by Equitable's increased number of employees or by North Penn's reduced number of employees. Nor have petitioners shown, or submitted evidence from which we can ascertain for any of such years, the portion or approximate portion, if any, of the time of North Penn's reduced number of employees that was spent in perfoming services for or in behalf of Equitable. Further, the record is silent as to the portion or approximate portion, if any, of the decreases in North Penn's advertising that were taken over by Equitable. If, as is contended by petitioners, the publication and distribution of the Weekly News by North Penn in the Daily Reporter's circulation area served to promote increases in Equitable's income from advertisements *245 in the Reporter and subscriptions to that publication and the income therefrom and to protect Equitable from competition, we think it is significant that, as the circulation of the Weekly News decreased, Equitable's gross income from advertising increased and the circulation of the Reporter and Equitable's gross income therefrom also increased as is shown by the following: Average weekly
Equitable's
Average daily
Subscription
distribution
gross income
circulation of
income from
of copies of
from adver-
Daily Re-
Daily Re-
Weekly
Year
tising
porter
porter
News
1952
$5,030,922
6,495
$32,176.00
7,550
1953
5,308,995
7,043
38,370.27
6,900
1955
5,732,690
7,544
51,217.22
6,500
1960
5,851,426
9,891
78,705.24
5,600
The record shows that in the distribution of the News no check was made to ascertain whether any of the people living in the houses to which it was delivered were subscribers to the Daily Reporter. In view of that and of the fact that constant and extensive competition for advertising existed in the circulation area of the Reporter, which was the distribution area of the News, we observe that the record *246 fails to show why the average weekly number of copies of the News was reduced by approximately 2,000 copies during the period from 1952 through 1960. If the publication and distribution of the News contributed so substantially to the income of Equitable from advertising in and subscriptions to the Reporter, as petitioners contend, it would appear that a high level of publication and distribution of the News would at least have been maintained and not reduced as is shown herein. In connection with the foregoing it is observed that Berky, in illustrating how the News contributed to the promotion of Equitable's income from subscriptions to the Daily Reporter, testified in effect that in an issue of the News in an undisclosed year, there was a concentration of news as to the North Wales section of the Reporter's circulation area; that a copy of that issue of the News was distributed to each house in that section; that in another issue of the News, in an undisclosed year, there was a concentration of news as to the Hatfield section of the Reporter's circulation area; that a copy of that issue of the News was distributed to each house in that section; that later Berky sent "circulation *247 men from the Reporter" into the sections and after a period of some months the number of subscribers to the Reporter increased in the North Wales section, to an extent not disclosed, and the number of subscribers to the Reporter in the Hatfield section increased to almost twice the original number, which is not shown. The foregoing testimony, standing alone in the record as it does, is not impressive. It may well relate to periods subsequent to the last of the taxable years in issue and also may have involved few original and few new subscribers. In addition, it assumes, rather than establishes, that all of the new subscribers in subscribing to the Reporter had knowledge of or familarity with the News and were influenced thereby rather than by the attraction and appeal of the Daily Reporter and the sales pitch of the "circulation men from the Reporter." The record shows that North Penn sustained net losses from its operations as follows for the indicated years which cover the period from its inception in September 1950 through September 30, 1955: Year ended
Sept. 30
Net loss
1951
$ 3,612.28
1952
7,052.37
1953
4,674.77
1954
9,074.96
1955
6,920.69
Total
$31,335.07
*248 The following is a statement of the amounts of advertising income participation omitted by Equitable from its calendar year income tax returns for the indicated years pursuant to the advertising income participation agreements for such years and the amounts of that type of income included by North Penn in its gross sales reported in its fiscal year returns for the indicated years: Fiscal
Included in gross
Calendar
Omitted by
year ended
receipts by
year
Equitable
Sept. 30
North Penn
1956
$ 30,763.01
1956
$ 24,225.28
1957
24,736.64
1957
24,651.85
1958
27,330.50
1958
26,468.45
1959
26,809.08
1959
27,219.40
1960
32,548.34
1960
31,161.49
Total
$142,187.57
$133,726.38
An elimination from its gross sales reported in its income tax returns for the indicated years, of the above amounts of advertising participation income included therein for such years by North Penn, discloses net losses for North Penn of the following amounts for its respective fiscal years: Fiscal year ended
Sept. 30
Net loss
1956
$10,021.54
1957
14,649.92
1958
16,185.11
1959
13,424.68
1960
14,589.25
Total
$68,870.50 The total of *249 the foregoing $68,870.50 of net losses for the years 1956 through 1960 and North Penn's net losses of $31,335.07 for its fiscal years 1951 through 1955 is $100,205.57. The total amount of advertising participation income omitted by Equitable from its income tax returns for the years 1956 through 1960, $142,187.57, exceeds North Penn's total losses for its taxable years 1956 through 1960, $68,870.50, by $73,317.07. Or expressed otherwise, the $142,187.57 exceeds North Penn's total losses from its inception in September 1950 through September 30, 1960, $100,205.57, by $41,982. Or expressed in another way, the $142,187.57 exceeds the total of North Penn's losses from its inception through September 30, 1960, $100,205.57, plus the cost of the North Penn stock to Knipe and Berky in July 1952, $24,000, or a total of $124,205.57, by $17,982. In addition, at the end of its fiscal year 1960, North Penn was still in business, owning its plant and equipment and other assets totaling approximately $62,750, and having an accumulated earned surplus of approximately $23,465. Its stock was neither owned nor controlled by Equitable but by Knipe and Berky who were in a position to dispose of it to *250 anyone they might wish, whether an aggressive or prospectively aggressive competitor of Equitable, or otherwise. Equitable's taxable net income as reported by it in its income tax returns and the income omitted from its returns under the advertising income participation agreements were as follows for the indicated years: Taxable net
Income
Year
income reported
omitted
1952
$31,887.94
1953
23,205.92
1954
36,059.99
1955
45,924.48
1956
26,782.58
$30,763.01
1957
27,423.79
24,736.64
1958
24,168.75
27,330.50
1959
24,096.39
26,809.08
1960
[1] 3,355.40 32,548.34
The foregoing tabulation shows that in 1952, the year in which Knipe and Berky purchased the stock of North Penn, Equitable reported a taxable net income of $31,887.94 and that thereafter through 1960 that amount was never exceeded or equaled except in 1954 and 1955 when the amounts were $36,059.99 and $45,924.48, respectively. On October 1, 1955, the first of the advertising income participation agreements between Equitable and North Penn became effective. Annually thereafter through 1960 a new agreement *251 was made. For 1956, the first of Equitable's full taxable years following the effective date of the first agreement, Equitable's reported net income dropped from $45,924.48 in 1955 to $26,782.58 and never thereafter through 1960 exceeded or equaled that amount, except for 1957 when the amount was $27,423.79, or $641.21 in excess of the amount reported for 1956. The above tabulation shows that for each of its taxable years 1956, 1958, 1959, and 1960 Equitable omitted from its returns substantially more income than it reported as taxable net income. For the 5-year period 1956 through 1960, Equitable reported total net taxable income of $105,826.91 while for the same period it omitted from its advertising income $142,187.57. Concededly the formula which was employed in arriving at such situation would never under any circumstances result in any portion of North Penn's income accruing to or becoming payable to Equitable. At the trial herein Knipe exhibited a lack of familiarity with the formula and the computations thereunder, and Berky disclosed that, in approving the formula and the computation thereunder, he had done so without noting the effect of the payment of the amounts computed *252 by Gottshall under the formula on Equitable's net income. The foregoing, considered in connection with the remainder of the record bearing on the question, is strongly indicative that the several yearly advertising income participation agreements entered into by Equitable and North Penn for the payment to North Penn by Equitable of portions of its gross advertising income were entered into with indifference as to their effect on Equitable's net income. From what has been said above and from a careful consideration of the entire portion of the record bearing on the question, we are unable to find that during the taxable years in issue, 1956 through 1960, North Penn made any substantial contribution to the production of any of the income reported by Equitable or omitted by Equitable in such years. In our opinion and we have found accordingly the several advertising income participation agreements entered into by Equitable and North Penn with respect to such years did not constitute real and genuine business transactions entered into by Equitable for profit or for any other proper business purpose but were for the mere purpose of distributing to North Penn earnings and profits of Equitable *253 without a business basis therefor. Accordingly the respondent's determination that the amounts of advertising income received by Equitable during such years but omitted by it from its income tax returns for those years were properly reportable by Equitable is sustained. Further, the alternative contention of petitioners that the amounts of advertising income omitted by Equitable from its income tax returns for the years in issue constituted ordinary and necessary business expenses of Equitable for such years and were deductible by it as such is denied. Because of their factual differences, the cases relied on by petitioners are not applicable or controlling here. The respondent is sustained as to this issue. Issue 2. Disallowance of Amounts Paid by Equitable to Knipe and Berky and Deducted as Traveling Expenses Opinion In determining the deficiencies in issue the respondent determined that the following amounts paid to petitioners George W. Knipe and Howard C. Berky in the indicated years and deducted by Equitable as traveling expenses did not represent ordinary and necessary business expenses and therefore were not allowable deductions to Equitable: Year
Amount
1956
$3,297.18
1957
3,380.99
1958
3,316.16
1959
3,456.18
1960
3,191.15
*254 The parties have agreed that the foregoing amounts were deductible in part and nondeductible in part as follows: Amount
Amount
Year
deductible
nondeductible
1956
$2,229.16
$1,068.02
1957
2,526.42
854.57
1958
2,428.31
887.85
1959
2,579.99
876.19
1960
2,596.90
594.25
Effect will be given to the agreement of the parties in a redetermination of the deficiencies under Rule 50. Issue 3. Disallowance of Deductions Taken by Equitable in 1960 for Engineering Services and Legal Services Which Were Determined To Be Capital Expenditures Not Recoverable Through Depreciation or Amortization Findings of Fact On March 28, 1958, Equitable applied to the Federal Communications Commission, sometimes hereinafter referred to as FCC, for a construction permit for an AM radio broadcasting station in Lansdale, Pennsylvania. After proceedings before FCC a construction permit was issued to Equitable on February 10, 1960. After construction of the radio station had been completed and Equitable had filed proof of its construction in accordance with specifications stated in the construction permit, FCC on October 12, 1960, authorized Equitable to conduct program *255 tests in accordance with section 3.96 of FCC's rules, pending FCC's action on Equitable's application for a broadcast station license which was filed by Equitable with FCC on or about the time Equitable filed proof of construction of the station. The radio station had a directional antenna array and was assigned the call letters WNPV. From October 12, 1960, to January 30, 1962, Equitable broadcast under the program test authority. On January 31, 1962, FCC issued to Equitable a standard broadcast station license which authorized Equitable to broadcast from January 31, 1962 to August 1, 1963. On July 10, 1963, FCC issued to Equitable a certificate of renewal of license which renewed the foregoing standard broadcast station license, on the same conditions and in accordance with the same provisions, from August 1, 1963 to August 1, 1966. In its income tax return for 1960 Equitable deducted as ordinary and necessary business expenses $7,082.44 for legal services and $13,096.56 for engineering services incurred in connection with its application to FCC for a construction permit and broadcasting license for radio station WNPV and other general legal and engineering matters respectively. *256 The respondent determined that the entire amount of each of the deductions represented capital expenditures paid in obtaining a license from FCC to construct and operate radio station WNPV, that the amounts of the deductions were not allowable as ordinary and necessary business expense and that such amounts were not recoverable through depreciation or amortization. The parties are in agreement that of the foregoing deduction of $7,082.44 for legal services, the amount of $2,000, which was expended for general legal services, is deductible for 1960 as an ordinary and necessary business expense and that the remainder, $5,082.44, represents a capital expenditure for legal services rendered in connection with Equitable's application to FCC for a construction permit and broadcasting license for radio station WNPV. The parties also are in agreement that of the deduction of $13,096.56 for engineering services, the amount of $465.16, which was expended for general engineering services, is deductible for 1960 as an ordinary and necessary business expense, and that the remainder, $12,631.40, represents a capital expenditure for engineering services rendered in connection with Equitable's *257 application to FCC for a construction permit and broadcasting license for radio station WNPV. As to the foregoing $12,631.40 of capital expenditures for engineering services, $3,556.91 thereof represents an expenditure made by Equitable for engineering services rendered in adjusting the directional antenna array which comprises part of the transmitting equipment of station WNPV. The adjustment constituted a portion of the work necessary to complete the construction of the station in accordance with the requirements of the construction permit and proof of which was required by FCC before granting program testing authorization. Normally the adjustment of directional antenna arrays consists of changing existing circuits and does not involve the addition of any equipment. A reasonable estimate of the useful life of the adjustment involved herein is 4 years. In the radio industry a radio station is considered as being in business when after having received authorization to conduct program tests, it begins broadcasting programs to the public. As shown by FCC's 29th Annual Report which was for the fiscal year ended June 30, 1963, placed in evidence as Exhibit 46 by petitioners, the *258 number of commercial AM radio broadcasting stations licensed and operating, stations holding authorizations to operate, and the total stations on the air at the close of the following fiscal years ended June 30 and the number of stations deleted during such years were as follows: Holding
Stations
authori-
Total sta-
deleted
zation to
tions on
during
Year
Licensed
operate
the air
year
1949
1,963
43
2,006
55
1950
2,118
26
2,144
70
1951
2,248
33
2,281
35
1952
2,333
22
2,355
25
1953
2,439
19
2,458
23
1954
2,565
18
2,583
29
1955
2,719
13
2,732
18
1956
2,871
25
2,896
18
1957
3,044
35
3,079
14
1958
3,218
35
3,253
17
1959
3,328
49
3,377
12
1960
3,442
41
3,483
11
1961
3,545
57
3,602
2
1962
3,686
59
3,745
18
1963
3,809
51
3,860
18
Total
43,854
365 The annual average number of the foregoing stations on the air for the 15-year period was 2,924 and the annual average number of stations deleted and no longer on the air during the same period was 24, or approximately 8/10ths of 1 percent of the annual average number of stations on the air. As of July 1, 1962, the *259 beginning of FCC's fiscal year ending June 30, 1963, FCC had pending 637 applications for renewal of AM station licenses; during that fiscal year it received 1,371 applications for license renewals and returned 8 applications to processing, making total applications for license renewals of 2,016 before it for that fiscal year. Of the foregoing total, FCC granted 1,377 applications, dismissed, denied or returned 20, designated 8 for rehearing, and had pending 611 applications at the close of June 30, 1963. The public's growing awareness of the obligations of broadcast licensees led it to express its views to FCC on this subject in increasing numbers during FCC's fiscal year 1963. This in turn brought about a substantial increase in the number of investigations of broadcast operations and in the number of stations against which sanctions were imposed. During its fiscal year 1963, FCC denied license renewals to 8 stations and 17 others were in renewal proceedings. Of the 8 stations whose license renewal applications were denied, one was denied for conducting "rigged" contests, altering program logs, etc.; one was denied for conducting vulgar and suggestive programs, misrepresentations, *260 etc., but this denial was stayed pending court appeal; and the remaining 6, which were owned by the same company, were denied for unauthorized transfer of control and technical violations. Of the 17 stations involved in proceedings to determine whether their licenses should be renewed, the reasons for such proceedings included: character qualifications; false program logs and misrepresentation; antitrust consideration; unauthorized transfers; lack of control and technical violations. FCC during its fiscal year 1963 revoked 5 station licenses and 8 others were in revocation proceedings. The reasons therefor were similar to those in the cases of the stations involved in license renewal proceedings. As a result of FCC's 1960 statement of policy that broadcasters are required to make efforts to ascertain and fulfill the needs and desires of the people in the communities served by the stations, FCC deferred a large number of renewal applications pending resolution of this and other questions raised by examination of station performance. As of June 30, 1963, the deferred AM, FM, and TV renewal applications totaled 476 as compared to 397 the previous year. Opinion In its income tax *261 return for 1960 Equitable deducted as ordinary and necessary business expenses $7,082.44 for legal services and $13,096.56 for engineering services incurred in connection with its application to FCC for a construction permit and broadcasting license for radio station WNPV and other general legal and engineering matters, respectively. The respondent determined that the entire amount of each of the foregoing deductions represented capital expenditures paid by Equitable in obtaining a license from FCC to construct and operate station WNPV, that the amounts of the deductions were not allowable as ordinary and necessary business expense and were not recoverable through depreciation or amortization. The parties have agreed, as set out in our findings, that a stated portion of each deduction was allowable as an ordinary and necessary business expense and effect will be given to such agreement in a recomputation of the deficiencies under Rule 50. The parties are in agreement that the remainder, $5,082.44, in the case of the deduction for legal services, and $12,631.40, in the case of the deduction for engineering services, represents capital expenditures made by Equitable in connection with *262 its application to FCC for a construction permit and a broadcasting license for radio station WNPV. Having thus agreed, the parties expressly stated that they reserved the right to present their respective positions by competent evidence and legal argument with respect to the issue, which their agreement was not intended by the parties to resolve, of whether the amounts of $5,082.44 for legal services and $12,631.40 for engineering services incurred in connection with the applications to FCC or may not be amortized. As disclosed by our findings, Equitable filed two applications with FCC. The first was filed on March 28, 1958, and was for a permit to construct an AM radio station in Lansdale, Pennsylvania. Pursuant to that application FCC issued to Equitable on February 10, 1960, a permit to construct the station according to certain stated specifications. After completion of the station in accordance with the specifications stated in the construction permit and after filing proof thereof, as well as filing an application for a broadcast license to operate the station, FCC on October 12, 1960, authorized Equitable to conduct program tests in accordance with section 3.96 of FCC's rules *263 pending FCC's consideration of the application for a broadcast license to operate the station. FCC on January 31, 1962, issued to Equitable a standard broadcast station license for the period January 31, 1962 to August 1, 1963. Pursant to the above-mentioned reservation by the parties herein to their agreements respecting the amounts of capital expenditures here involved for legal services in the amount of $5,082.44 and for engineering services in the amount of $12,631.40, the petitioners have submitted evidence showing that $3,556.91 of the $12,631.40 represented an expenditure made by Equitable for engineering services rendered in adjusting the directional antenna array which comprised part of the transmitting equipment of station WNPV. The evidence further shows that the adjustment constituted a portion of the work necessary to complete construction of the station in accordance with the specifications stated in the construction permit, that the adjustment was completed prior to Equitable's filing with FCC proof of completion of construction of the station and prior to Equitable's filing with FCC an application for a broadcast license to operate the station and that a reasonable *264 estimate of the useful life of the adjustment was 4 years. The petitioners contend that on the basis of the foregoing showing we should hold that the $3,566.91 expended by Equitable for the adjustment is to be amortized or depreciated over a 4-year period. Since the adjustment was required by the specifications for the completion of construction of the station, we are of the opinion that the amount expended for adjustment represents a capital expenditure directly incurred in the construction of the station and is to be treated as a part of construction costs of the station rather than part of the cost of obtaining either the construction permit or of obtaining the broadcasting license. Accordingly we sustain the petitioners' contention and hold that the cost of the adjustment is to be depreciated over a 4-year period beginning with the date Equitable began conducting program tests. There remains for consideration the capital expenditures of $5,082.44 expended for legal services and the remaining amount of $9,074.49 expended for engineering services, or a total of $14,156.93. As to that amount there is no showing that it, or any portion of it, is attributable to the cost of the *265 construction of the station. The petitioners, relying primarily on the holding in WDEF Broadcasting Company v. United States, 215 F. Supp. 818 (E.D. Tenn. 1963), take the position that Equitable was entitled to amortize the capital expenditures of $14,156.93 over the life of its construction permit and its initial license, a period extending from February 10, 1960 to August 1, 1963, or approximately 42 months, and to deduct amortization allowances accordingly in its income tax returns for the taxable years involved in such period. In the alternative, the petitioners take the position that Equitable was entitled to amortize the $14,156.93 over the useful life of station WNPV, which they state "may be reasonably estimated at 40 years" and to deduct amortization allowances accordingly in its income tax returns over such period of years. The respondent, pointing out that 1960 is the latest of Equitable's taxable years involved herein and that its broadcasting license was not issued until January 31, 1962, contends that all that Equitable had received from FCC at the end of 1960 was the mere temporary provisional authority to conduct program tests, that the petitioners have *266 failed to show that the period of the use of such authority in Equitable's business could be estimated with reasonable accuracy and that accordingly the petitioners have failed to show that Equitable was entitled to deduct for 1960 any allowance for depreciation or amortization with respect to either such authority or the license issued in 1962. In support of his contention the respondent cites, among others, KWTX Broadcasting Co., 31 T.C. 952 (1959), affd. 272 F. 2d 406 (C.A. 5, 1959); Morris Nachman, 12 T.C. 1204 (1949), affd. 191 F. 2d 934 (C.A. 5, 1951). Pertinent provisions of the Code and of the Regulations are set out below. [3]
*267 FCC was created by Congress in 1934 to centralize Federal regulation of wire and radio communications previously handled by various Government agencies. During 1960 some of the provisions of the Communications Act of 1934, as amended, respecting applications for and the issuance of licenses for the operation of radio broadcasting stations and applications for the renewal of and the renewal of such licenses were as follows: FCC, if public convenience, interest or necessity will be served thereby, subject to the limitations contained in the Act, shall grant to any applicant therefor a station license provided for by the Act. (Sec. 307(a), 47 U.S.C.) No license granted for the operation of a broadcasting station shall be for a longer term than 3 years and any license granted may be revoked as provided by the Act. Upon the expiration of any license, upon application therefor, a renewal of such license may be granted from time to time for a term not to exceed 3 years in the case of broadcasting licenses, if FCC finds that public interest, convenience and necessity would be served thereby. In order to expedite action on applications for renewal of broadcasting station licenses and *268 in order to avoid needless expense to applicants for such renewals, FCC shall not require any such applicants to file any information which previously has been furnished to FCC or which is not directly material to the considerations that affect the granting or denial of such applications, but FCC may require any new or additional facts it deems necessary to make its findings. Pending any hearing and final decision on such an application and the disposition of any petition for rehearing FCC shall continue such license in effect. No renewal of an existing license in the broadcast or common carrier services shall be granted more than 30 days prior to the expiration of the original license. (Sec. 307(d) and (e), 47 U.S.C.) All applications for station licenses, or modifications or renewals thereof, shall set forth such facts as FCC by regulation may prescribe as to citizenship, character, and financial, technical and other qualifications of the applicant to operate the station; the ownership and location of the proposed station and of the stations, if any, with which it is proposed to communicate; the frequencies and power desired to be used; the hours of the day or other periods of *269 time during which it is proposed to operate the station; the purposes for which the station is to be used; and such other information as it may require. FCC at any time after the filing of such original application and during the term of any such license, may require from an applicant or licensee further written statements of fact to enable it to determine whether such original application should be granted or denied or such license revoked. Such application and/or such statement of fact shall be signed by the applicant and/or the licensee. (Sec. 308(b), 47 U.S.C.) In the case of each application filed with FCC for renewal of station license, FCC shall determine whether the public interest, convenience, and necessity will be served by the granting of such application, and, if FCC upon examination of such application and upon consideration of such other matters as FCC may officially notice shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application. (Sec. 309(a), 47 U.S.C.) In the case of any license renewal application filed with FCC, if a substantial and material question of fact is presented or FCC for any *270 reason is unable to make the finding that public interest, convenience, and necessity would be served by the granting thereof, it is required to hold a formal hearing on the ground or reasons then obtaining with due notice to the applicant, and in which the applicant shall be permitted to participate. (Sec. 309(e), 47 U.S.C.) If FCC denies an application for the renewal of a station license, the applicant may appeal from such action to the United States Court of Appeals for the District of Columbia. (Sec. 402(b), 47 U.S.C.) Section 3.96 of FCC's rules, pursuant to which Equitable was authorized to conduct program tests pending action by FCC on Equitable's application for a broadcast station license to operate station WNPV, provided as follows: (a) Upon completion of construction of a standard broadcast station in accordance with the terms of the construction permit, the technical provisions of the application therefor, and the rules and regulations and applicable engineering standards and when an application for station license has been filed showing the station to be in satisfactory operating condition, the permittee may request authority to conduct program tests: Provided, *271 That such request shall be filed with the Commission at least ten (10) days prior to the date on which it is desired to begin such operation and that the Engineer in Charge of the radio district in which the station is located is notified. All data necessary to show compliance with the terms and conditions of the construction permit must be filed with the license application. If the station is using a directional antenna, a proof of performance must also be filed as required by § 3.33(b). (b) Program tests shall not commence until specific Commission authority is received. The Commission reserves the right to change the date of the beginning of such tests or to suspend or revoke the authority for program tests as and when such action may appear to be in the public interest, convenience, and necessity. (c) Unless sooner suspended or revoked program test authority continues valid during Commission consideration of the application for license and during this period further extension of the construction permit is not required. Program test authority shall be automatically terminated by final determination upon the application for station license. (d) All operation on program test *272 authority shall be in strict compliance with the rules governing standard broadcast stations and in strict accordance with representations made in the application for license pursuant to which the tests were authorized. (e) The granting of program test authority shall not be construed as approval by the Commission of the application for station license. In view of the above provisions of section 3.96 of FCC's rules it is apparent that from October 12, 1960, when Equitable was authorized to conduct program tests until January 31, 1962, when FCC issued to Equitable a standard broadcast station license, all Equitable had under its authorization to conduct program tests was a mere temporary authority subject to suspension or revocation by FCC at any time it might appear to FCC that such action would be in the public interest, convenience and necessity. At all events, such program tests authority was automatically terminable by final determination of Equitable's application for a broadcast station license. As a consequence it is our opinion that Equitable's authorization was for an indefinite and uncertain duration at all times prior to January 31, 1962, when it was terminated by FCC's *273 final determination of Equitable's application for a broadcast station license and the issuance of such license to Equitable. That license was for the stated period January 31, 1962, until August 1, 1963, and upon application therefor by Equitable was renewed on July 10, 1963, by FCC for the stated period August 1, 1963 to August 1, 1966. In WDEF Broadcasting Company v. United States, supra, relied on by petitioners, the taxpayer in its fiscal year ended March 31, 1954, expended a stated sum in acquiring a permit for the construction of a television station and a television license for the operation of the station. The question before the Court was whether the sum expended by the taxpayer might be amortized for income tax purposes over the period of construction of the station and the first 3-year term of the license. Taking the position that the material inquiry there was as to the stated term of the television license in question rather than as to the custom or practice of FCC in granting license renewals in other cases, the Court held that taxpayer was entitled to amortize over the period of construction of the station and the initial 3-year term of the license the *274 sum it had expended in acquiring the construction permit and the license. In so holding the Court said: It is a matter of common knowledge, and may be judicially noticed, that the power periodically to grant or refuse renewal of television licenses is the principal weapon in the regulatory arsenal of the Federal Communications Commission. It ill behooves the Government to serve its regulatory ends by granting licenses of a definite, limited duration, reserving the power to grant or refuse renewal, and at the same time to contend for tax purposes that the specified definite duration of such licenses should be disregarded. The fact that there is little or no history of failure to renew licenses can only be interpreted as meaning that the licensees have merited renewal of their licenses. Any other interpretation would impugn the Federal Communications Commission in the administration of the law. To allow a tax consequence favorable to the taxpayer only when a history of license revocation for unsatisfactory broadcast performance is established but to deny such tax treatment when a history of license renewals for satisfactory broadcast performance is established, would indeed be an *275 anomalous result. We are unable to agree with the foregoing conclusion reached by the Court and the reasoning upon which it is based. We have set out above provisions of certain sections of the Communications Act of 1934 relating to applications for and issuance of radio broadcasting licenses, and for renewal thereof and the rights provided to applicants for hearings before FCC or matters in controversy between them and for judicial determination of matters which FCC might decide adversely to applicants. From a consideration of such provisions we think it is apparent that licensees not only have been given broad rights respecting renewal of their licenses but by statute have been given the specific means of resisting by court appeal a denial thereof by FCC. In Westinghouse Broadcasting Co., 36 T.C. 912 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962), certiorari denied 372 U.S. 935 (1963), we were called upon to consider the doctrine that contract renewal provisions and actual renewals may be ignored in determining useful lives of contracts and that estimates need not be made of the probability of renewal. We pointed out that doctrine had not *276 been followed by this Court in cases arising since 1930 involving leases, franchises, and licenses, citing as to licenses Morris Nachman, 12 T.C. 1204 (1949), affd. 191 F. 2d 934 (C.A. 5, 1951); Tube Bar, Inc., 15 T.C. 922 (1950); V. P. Shufflebarger, 24 T.C. 980 (1955); and KWTX Broadcasting Co., 31 T.C. 952 (1959), affd. 272 F. 2d 406 (C.A. 5, 1959). We further stated that this Court made clear its divorcement from that doctrine in its unanimous opinion in Morris Nachman, supra, at 1211, involving a license where it was also stated: "In addition, we are confronted with the fact of renewal of the license during the year before us, and the vitality of this event can not be minimized." In the WDEF Broadcasting Company case, the respondent cited and relied on KWTX Broadcasting Co., supra, wherein a taxpayer who in 1954 had made certain expenditures in obtaining a television station construction permit and a license for the operation of the station sought to amortize such expenditures over a period of 56 months representing the combined lives of the construction permit *277 of a life of 20 months and the initial television broadcasting license of a life of 36 months and to deduct in 1954, 1/56 of such expenditures on the ground that one month of the 56-month period passed in 1954. Being of the opinion from the evidence there presented that it was altogether likely that the taxpayer, prior to the expiration of its license, would apply to FCC for a renewal thereof and that such renewal would be granted, this Court concluded that the taxpayer was not entitled to amortize over a period of 56 months the expenditures it had made in obtaining the construction permit and the license. In the KWTX Broadcasting Co. case our holding was based on what we considered it was "altogether likely" the taxpayer and FCC would do prior to the expiration of the taxpayer's initial license. In the instant case we are faced with the fact that prior to the expiration of its initial license on August 1, 1963, Equitable made application for a renewal thereof and on July 10, 1963, FCC issued to Equitable a certificate of renewal thereof on the same conditions and in accordance with the same provisions from August 1, 1963 to August 1, 1966. Once the identity of the renewed license *278 with the initial license is established, as is the case here, there remains to be determined the probable useful life of the license with all of its probable renewals. The probability of future renewals is a question of fact and where the respondent has determined that the license was reasonably certain of renewal indefinitely, the burden is upon the taxpayer to prove that determination is erroneous. The taxpayer must show more than uncertainty as to the length of the useful life of the license. Cf. Westinghouse Broadcasting Co., supra, at 921. Implicit in the respondent's determination that the $14,156.93 here in issue was not recoverable through depreciation or amortization is the determination that Equitable's initial license was reasonably certain of renewal indefinitely. The fact that before the expiration of the license it was renewed for 3 years tends to support the respondent's determination as to the reasonable certainty of renewal indefinitely and bars the allowance of the contention of petitioners that the amount in issue is to be amortized over only the combined lives of Equitable's construction permit and of its initial license. KWTX Broadcasting Co., supra. *279 By their alternative contention the petitioners seek a holding that the amount in issue is amortizable over the useful life of Equitable's radio station WNPV which they state may be reasonably estimated at 40 years. As was pointed out above the respondent by his determination that the amount in issue was not recoverable through depreciation or amortization has determined that Equitable's initial license was reasonably certain of renewal indefinitely and that the burden is upon petitioners to prove that that determination is erroneous. They have the same burden under their alternative contention. Since AM radio broadcasting licenses are transferable with the approval of FCC, the petitioners' burden would not be altered by a showing that the reasonably estimated useful life of Equitable's station WNPV is 40 years, a showing which the petitioners have not made. However, treating the petitioners' alternative contention as a request for a finding that the reasonably estimated useful life of the initial license was 40 years, we will examine from that standpoint the record and the petitioners' contentions relating thereto. The petitioners take the position on brief that FCC's Annual *280 Report for its fiscal year 1963 shows that from 1949 to 1963 there was an annual average of 3,132 AM radio broadcasting stations on the air and that during that period there was an annual average deletion of 24 stations. They contend that on the basis of the foregoing and of the requirement that such stations apply for a renewal license every 3 years there was an annual average of 1,044 licenses that came up for renewal each year; that by dividing the annual average number of stations deleted each year, 24, by the annual number of licenses that came up for renewal, 1,044, it follows that annually approximately 2.5 percent of such radio station licenses were not renewed, and that accordingly a reasonably estimated useful life of Equitable's station WNPV should be found to be 40 years. In our following discussion we will treat the immediately foregoing clause as though it stated Equitable's license in the place of station since what we basically are concerned with here is Equitable's license and not its station building and other physical properties in and about the building. As set out in our findings, the annual average number of AM radio stations on the air during the 15-year period *281 1949 through 1963 was 2,294, not 3,132 used by petitioners above, the annual average number of stations deleted and no longer on the air during the same period was 24, or approximately 8/10ths of 1 percent of the annual average number of stations on the air. Without submitting evidence showing for the 15-year period or from which determinations could be made of the annual average number of licenses for the renewal of which applications were filed with FCC, and the annual average number of license renewal applications that were denied by FCC, or the average annual percentage of license renewal applications that were denied by FCC, the petitioners on brief offer us as substitutes therefor the amount of 1,044 as the average annual number of license renewal applications filed with FCC and approximately 2.5 percent as the average annual percentage of license renewal applications that were denied by FCC. The foregoing proposed amounts were arrived at by a combination of a conclusion as to the number of licenses that came up for renewal every year, which conclusion in turn was based on an assumption and the further assumption that all station deletions were due to denials of license renewal *282 applications, matters not shown by the record to have been facts. Although the record shows the number of stations deleted during each year of the 15-year period, it does not show the reasons therefor except in part for the fiscal year 1963. The record shows that in 1963 there were 18 station deletions. In that year FCC revoked 5 licenses, refused license renewals to 8 others and in all of those cases its action was predicated upon one or more unauthorized acts or other violations by the respective licensees. Examining the contentions of petitioners in the light of what is shown by the record as to 1963, the only year as to which we have been furnished information as to license renewal applications filed and license renewal applications denied, we find that in that year FCC had before it 2,016 applications for license renewal of which it, during that year, denied renewal of 8, or approximately 4/10ths of 1 percent of the applications before it. Or examining the situation from the standpoint of license renewal applications actually received during the year and applications denied during the year, irrespective of whether filed in that year, we find that during the year FCC received *283 1,371 applications and denied renewal of 8 applications or approximately 6/10ths of 1 percent. From the foregoing it is apparent that the evidence relating to 1963, the only year as to which the petitioners have presented relevant data, militates against, instead of supports the position of the petitioners that the reasonably estimated useful life of Equitable's license was 40 years. In connection with their alternative contention, the petitioners cite Indiana Broadcasting Corporation, 41 T.C. 793 (1964), on appeal (C.A. 7, Aug. 10, 1964), and take the position that although that case did not involve an AM radio broadcasting license, as is involved here, but involved network affiliation contracts, the two are sufficiently similar as to render the principles discussed and questions decided there relevant and persuasive here. The petitioners, however, do not point us to anything in the record respecting the license here in issue or to anything in the Indiana Broadcasting case respecting the network affiliation contracts there involved in support for the claimed similarity between the two. On the other hand, the Court in its opinion in Indiana Broadcasting, at page 813, *284 footnote 10, said: A network affiliation contract is unlike distributorships and other arrangements of "indefinite" length where a franchise holder may have rights to resist termination, either by specific terms of contract or by general rules of law. * * * As pointed out above, radio broadcasting licensees have been given by statute the specific means of resisting by court appeal a denial by FCC of their applications for renewal of their licenses. In other words at the instance of a licensee any denial by FCC of the licensee's application for license renewal can not be effective except by court approval. In view of the foregoing and what was said in the above-quoted footnote, we are unable to find that the petitioners have established the existence of the similarity claimed by them. Accordingly we find it unnecessary to determine whether the principles discussed and questions decided in Indiana Broadcasting are either relevant or persuasive here.
From what has been said above we are unable to find that the petitioners have shown that a reasonably estimated useful life of Equitable's radio broadcasting license was 40 years or any other definite period of time. Accordingly, the *285 alternative contention of the petitioners is denied. Being unable to find that Equitable was entitled to any deduction in 1960 on account of amortization or depreciation with respect to the $14,156.93 here in issue, we sustain the respondent's determination so far as it relates to such amount. Issue 4. Failure of Respondent to Determine That Assessment of the Deficiencies Determined by Him for 1956, 1957, and 1958 Against Equitable Was Barred by the Expiration of the Applicable Periods of Limitation Findings of Fact Equitable's income tax returns for the following years were filed on the indicated dates: Year
Date filed
1956
June 12, 1957
1957
June 13, 1958
1958
June 15, 1959
With respect to each of the foregoing taxable years and by one or more consents in writing timely signed, Equitable and respondent extended to December 31, 1962, the respective periods of limitation for assessment of tax or the mailing of notice of deficiency with respect to such respective years. The notice of deficiency involved herein was mailed by respondent to Equitable on July 10, 1962. Opinion Since as shown by our findings, Equitable and respondent by consents in *286 writing have extended the periods of limitation for the respective years to December 31, 1962, and respondent mailed the notice of deficiency to Equitable on July 10, 1962, it is apparent that the periods of limitation for the respective years had not expired at the time of time mailing of the notice of deficiency. Respondent is sustained on this issue. George W. Knipe and Dorothy K. Knipe, Docket No. 3988-62. Issue 1. Respondent's Determination That Amounts Paid by Equitable to Petitioner George W. Knipe as Reimbursements for Traveling Expenses Constituted Constructive Dividends Findings of Fact In determining the deficiencies in issue the respondent determined that the following amounts paid by Equitable to Knipe as traveling expenses during the indicated years constituted constructive dividends to Knipe and were includable as such in his income tax returns for the respective taxable years: 1956
$1,560.00
1957
1,593.35
1958
1,621.05
1959
1,566.45
1960
1,530.00 Of the foregoing amounts the parties are in agreement that only the following amounts for the indicated years were so includable in Knipe's taxable income for the respective taxable years: *287 1956
$666.62
1957
458.17
1958
458.04
1959
466.25
1960
176.89
Opinion In a recomputation of the deficiencies under Rule 50 effect will be given to the agreement of the parties as set out in our findings. Issue 2. Respondent's Determination That One-Half of the Amounts Paid by Equitable to North Penn and Denominated Advertising Participation Expense Constituted Constructive Dividends to Knipe Findings of Fact In determining the deficiencies in issue the respondent determined that one-half of the amounts of gross income from advertising of Equitable which it omitted from its income tax returns for the years 1956 through 1960 and which it paid to North Penn in connection with its several advertising income participation agreements with North Penn, under the circumstances set out in our findings in the case of Equitable, supra, constituted constructive dividends to Knipe as follows: 1956
$15,381.50
1957
12,368.32
1958
13,665.25
1959
13,404.54
1960
16,274.17
Opinion The petitioners take the position that the instant issue essentially is one of fact; that the amounts in issue here were not paid by Equitable to Knipe and Berky *288 but were paid by Equitable to North Penn for its service to Equitable; that payment of the amounts in issue by Equitable to North Penn was in no sense a gift to, nor the satisfaction of, any obligation of Knipe and Berky; that neither Knipe nor Berky had any personal obligation to satisfy any of the obligations of North Penn; and that furthermore, neither Knipe nor Berky received any benefit from North Penn's receipt of the amounts in issue. As stated in our opinion in the case of Equitable, we are unable to find from the record that North Penn made any substantial contribution to the production of the income of Equitable for the years in issue. It follows then that the amounts paid by Equitable to North Penn were not paid for any discernible consideration. In addition we have found that Knipe and Berky, as officers of and stockholders in Equitable and North Penn, were in control of both corporations during the years in issue and that the payments made by Equitable to the latter in connection with the several advertising income participation agreements between the two corporations which Knipe and Berky caused them to enter into were not made by Equitable for any proper corporate *289 purpose. In this situation presented, Knipe and Berky might properly have caused Equitable in each of the years in issue to distribute to them directly the amounts of its income totaling the sums it omitted from its income tax returns and paid to North Penn during the respective years and thereupon transferred to North Penn such distributions from Equitable. By such a procedure Knipe and Berky clearly would have received income taxable to them as dividends and we do not understand petitioners to contend otherwise. The question for determination here is whether distribution of the amounts in issue directly to North Penn under the guise of payment for services rendered by it to North Penn during the years in issue obviates the result that would have followed if distribution first had been made directly to Knipe and Berky. In view of the principles enunciated and applied in Helvering v. Horst, 311 U.S. 112 (1940), affirming 39 B.T.A. 757 (1939) we think the answer to that question must be no. In the Horst case the taxpayer who was the owner of foreign state, municipal, and industrial coupon bonds, clipped therefrom and delivered before maturity to his son, *290 as a gift, negotiable interest coupons having a maturity date within the taxable year. Within such year payments were received on the coupons by the son who reported such amounts as income in his income tax return for that taxable year. The taxpayer was the owner of the bonds throughout the taxable year and kept his books and made his income tax returns on the cash receipts and disbursement basis. There it was held that the amounts received by the son on the coupons were taxable income to the taxpayer. In so holding, the Supreme Court said: Although the donor here, by the transfer of the coupons, has precluded any possibility of his collecting them himself, he has nevertheless, by his act, procured payment of the interest, as a valuable gift to a member of his family. Such a use of his economic gain, the right to receive income, to procure a satisfaction which can be obtained only by the expenditure of money or property, would seem to be the enjoyment of the income whether the satisfaction is the purchase of goods at the corner grocery, the payment of his debt there, or such non-material satisfactions as may result from the payment of a campaign or community chest contribution, or *291 a gift to his favorite son. Even though he never receives the money he derives money's worth from the disposition of the coupons which he has used as money or money's worth in the procuring of a satisfaction which is procurable only by the expenditure of money or money's worth. The enjoyment of the economic benefit accruing to him by virtue of his acquisition of the coupons is realized as completely as it would have been if he had collected the interest in dollars and expended them for any of the purposes named. Burnet v. Wells, supra. In a real sense he has enjoyed compensation for money loaned or services rendered and not any the less so because it is his only reward for them. To say that one who has made a gift thus derived from interest or earnings paid to his donee has never enjoyed or realized the fruits of his investment or labor because he has assigned them instead of collecting them himself and then paying them over to the donee, is to affront common understanding and to deny the facts of common experience. Common understanding and experience are the touchstones for the interpretation of the revenue laws. The power to dispose of income is the equivalent of ownership *292 of it. The exercise of that power to procure the payment of income to another is the enjoyment and hence the realization of the income by him who exercises it. * * * Furthermore, in holding as it did, the Court apparently considered as of no significance the fact that the son had reported as income the bond interest he had received from the coupons since no mention thereof was made in the Court's opinion. Although we recognize that what was said by the Court in the Horst case was in connection with the bond interest there involved, however, we are of the opinion that the principles there enunciated and applied are equally applicable here. In each of the years in issue Equitable had accumulated earnings and profits in excess of the amounts of income omitted from its returns. As stockholders and officers of Equitable, Knipe and Berky, had the power to cause it to dispose of its income and accumulated earnings and profits. They exercised that power by causing Equitable to make a disposition thereof by way of distributions to North Penn in amounts equal to the amounts of income omitted by Equitable in its income tax returns for the respective taxable years in issue without any business *293 purpose of Equitable. Under the Horst case, the foregoing power was the equivalent of ownership of the income and accumulated earnings and profits involved. The exercise of that power to procure payment of income and accumulated earnings and profits in the amounts in question to North Penn was the enjoyment and hence the realization of income by those who exercised the power, namely, Knipe and Berky. As a consequence the amounts in question are to be regarded as income taxable to them as dividends. As was pointed out in Binenstock v. Commissioner, 321 F. 2d 598 (C.A. 3, 1963), affirming, 36 T.C. 446 (1961), the principles enunciated in the Horst case were applied in the following cases which hold that a dominant stockholder of a corporation is taxable on a distribution of corporate earnings made at his behest to a third person for some purpose he wishes to serve, although he himself received no economic gain: Byers v. Commissioner, 199 F. 2d 273 (C.A. 8, 1952), certiorari denied 345 U.S. 907 (1953), affirming a Memorandum Opinion of this Court; Whitehead v. Commissioner, 148 F. 2d 718 (C.A. 4, 1945), affirming *294 a Memorandum Opinion of this Court; Clark v. Commissioner, 84 F. 2d 725 (C.A. 3, 1936), affirming 31 B.T.A. 1082 (1935). See also Biltmore Homes, Inc. v. Commissioner, 288 F. 2d 336 (C.A. 4, 1961), certiorari denied 368 U.S. 825 (1961), affirming a Memorandum Opinion of this Court, wherein the Court of Appeals for the Fourth Circuit said: The conclusion that Biltmore, the corporation, owned by the three brothers received the profit from the building operations must be approved. The additional determination that the three brothers themselves received taxable income from Biltmore in 1947 and 1948 is likewise supported by the evidence set out above. It is of no importance that the income did not pass through their hands, if such be the fact, for if it was diverted at their behest into the hands of others, it was nevertheless taxable to them. As was said in Clark v. Commissioner, 9 Cir., 266 F. 2d 698, 711: To constitute a distribution taxable as a dividend, the benefit received by the shareholder need not be considered *295 as a dividend either by the corporation or its shareholders, declared by the board of directors, nor other formalities of a dividend declaration need be observed, if on all the evidence there is a distribution of available earnings or profits under a claim of right or without any expectation of repayment. In view of what has been said above we are of the opinion that respondent's determination that one-half of the amounts of the income of Equitable for the years in issue omitted by it in its income tax returns for the respective years and paid to North Penn constituted income to Knipe taxable as dividends was correct. Accordingly the respondent is sustained as to this issue. Issue 3. Failure of Respondent To Determine That Assessment of the Deficiencies Determined by Him for 1956, 1957, and 1958 Against George W. Knipe and Dorothy K. Knipe Was Barred by the Expiration of the Applicable Periods of Limitation. Findings of Fact The income tax returns of petitioners George W. Knipe and Dorothy K. Knipe for the following years were filed on the indicated dates: Year
Date filed
1956
April 15, 1957
1957
April 15, 1958
1958
April 15, 1959
The gross income *296 stated by petitioners in their income tax return for 1956 was $31,966.74. They omitted therefrom gross income of $15,381.50 which was properly includable therein and which is an amount in excess of 25 percent of the amount of gross income stated in the return. With respect to each of the years 1957 and 1958 and by one or more consents in writing timely signed, the petitioners and respondent extended to December 31, 1962, the respective periods of limitations for assessment of tax or the mailing of notice of deficiency for such respective years. The notice of deficiency involved herein was mailed by respondent to the petitioners on July 10, 1962. Opinion As provided in subsection (a) of section 6501 of the Code of 1954, the general rule is that the period of limitations for the assessment of income tax is 3 years after the return was filed. However, subsection (e)(1)(A) of section 6501 contains an exception to the general rule contained in subsection (a) and provides that if the taxpayer omits from gross income an amount properly includable therein which is in excess of 25 percent of the gross income stated in the return, the tax may be assessed at any time within 6 years after *297 the return was filed. Since the petitioners omitted from the gross income stated in their return for 1956 an amount of $15,381.51 which was properly includable therein and which was in excess of 25 percent of the amount stated in the return, we conclude that the 6-year period of limitations was applicable to the taxable year 1956. Since the return for 1956 was filed on April 15, 1957, and 6 years from that date was April 15, 1963, a date subsequent to July 10, 1962, when the notice of deficiency was mailed by respondent to the petitioners, it is apparent that the period of limitations had not expired as to 1956 at the time of the mailing of the notice of deficiency. Since as shown by our findings, the petitioners and respondent by consents in writing have extended the periods of limitation for the taxable years 1957 and 1958 to December 31, 1962, and respondent mailed the notice of deficiency to petitioners on July 10, 1962, it is apparent that the periods of limitation for those years had not expired at the time of the mailing of the notice of deficiency. The respondent is sustained as to all 3 years on this issue. Howard C. Berky and Emma M. Berky, Docket No. 3989-62. Issue *298 1. Respondent's Determination That Amounts Paid by Equitable to Petitioner Howard C. Berky as Traveling Expenses Constituted Constructive Dividends. Findings of Fact In determining the deficiencies in issue the respondent determined that the following amounts paid by Equitable to Berky as traveling expense during the indicated years constituted constructive dividends to him and were includable as such in his income tax returns for the respective taxable years: 1956
$1,737.18
1957
1,787.64
1958
1,695.12
1959
1,889.73
1960
1,661.15
Of the foregoing amounts the parties are in agreement that only the following amounts for the indicated years were so includable in Berky's taxable income for the respective taxable years: 1956
$401.40
1957
396.40
1958
429.81
1959
409.94
1960
417.36
Opinion In a recomputation of the deficiencies under Rule 50 effect will be given to the agreement of the parties as set out in our findings. Issue 2. Respondent's Determination That One-Half of the Amounts Paid by Equitable to North Penn and Denominated Advertising Participation Expense Constituted Constructive Dividends to Petitioner Howard C. Berky. *299 Findings of Fact In determining the deficiencies in issue the respondent determined that one-half of the amounts of the gross income from advertising of Equitable which it omitted from its income tax returns for the years 1956 through 1960 and which it paid to North Penn in connection with the several advertising income participation agreements with North Penn under the circumstances set out in our findings in the case of Equitable, supra, constituted constructive dividends to Berky as follows: 1956
$15,381.51
1957
12,368.32
1958
13,665.25
1959
13,404.54
1960
16,274.17
Opinion Since the facts, circumstances, and issue relating to the amounts here involved are the same as involved in the like issue No. 2 in the case of George W. Knipe and Dorothy K. Knipe, supra, our conclusions and holding there are applicable here. Accordingly the respondent is sustained as to this issue. Issue 3. Failure of Respondent To Determine That Assessment of the Deficiencies Determined by Him for 1956, 1957, and 1958 Was Barred by the Expiration of the Applicable Periods of Limitation. Findings of Fact The income tax returns of petitioners Howard C. Berky and Emma *300 M. Berky for the following years were filed on the indicated dates: Year
Date filed
1956
April 16, 1957
1957
April 15, 1958
1958
April 15, 1959
The gross income stated by petitioners in their income tax return for 1956 was $31,750.34. They omitted therefrom gross income of $15,381.51 which was properly includable therein and which was in excess of 25 percent of the amount of gross income stated in the return. With respect to each of the years 1957 and 1958 and by one or more consents in writing timely signed, the petitioners and the respondent extended to December 31, 1962, the respective periods of limitations for assessment of tax or the mailing of notice of deficiency for such respective years. The notice of deficiency involved herein was mailed by respondent to the petitioners on July 10, 1962. Opinion Since the material facts are substantially identical and the questions involved are the same as in issue No. 3 in the case of George W. Knipe and Dorothy K. Knipe, supra, our conclusions and holding there are applicable here. Accordingly the respondent is sustained as to this issue. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: HOWARD C. BERKY and EMMA M. BERKY, docket No. 3989-62; and Equitable Publishing Company, docket No. 3990-62.↩
2. This is arithmetically incorrect. Arithmetically, the correct percentage is 12.90 percent, as petitioners admit.↩
1. Does not include salaries of Knipe and Berky. ↩
2. Includes only amounts paid to individual carriers employed by Equitable and does not include amounts paid to independent newspaper distribution agencies. ↩
3. Last quarter only. ↩
4. Newspaper only - does not include radio station personnel.↩
1. Before net operating loss deduction for net operating loss carryover.↩
1. After deduction of a loss of $26,723.38 on account of a radio station.↩
3. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. Sec. 1.167(a)-1 [Income Tax Regs.] Depreciation in general. (a) Reasonable allowance. Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(f) and § 1.167(f)-1. * * * (b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. Sec. 1.167(a)-3 [Income Tax Regs.] Intangibles. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.↩